May it please the Court, my name is Sean Austin and I have the pleasure of representing the petitioner Tomaso Bolanos-Reynoso. Ms. Bolanos-Reynoso spent 17 years serving the American people with distinction, ferreting out waste, fraud, and abuse. She spent nine years at Defense and Homeland Security and then six years at USDA, all the time establishing a stellar record. She is an immigrant who achieved the American dream, rising to her dream GS-15 position at the Office of the Assistant Secretary for Civil Rights. And then she discovered something she could not ignore. When she arrived at OSCQR in 2016, she found an office treating federal law as merely advisory. She discovered fraudulent billing practices, ghost employees and contracts, funds being illegally shifted to hide deficits. This very office charged with protecting civil rights was violating the public trust. She did what the law requires. She reported it. First to her supervisor, Winona Scott, then to the Inspector General, and then to the Was gross mismanagement argued in the below proceeding? I'm sorry. Was gross mismanagement argued in the below proceeding? And if so, where? She had mentioned the... She had testified explicitly about mismanagement at the hearing. I can provide you those citations. It would be Appendix 875 at 65, 511. She says, I didn't know how deep or complex that mismanagement was. The statute protects... Did she raise gross mismanagement to the special counsel? I believe so. I believe that she did raise... Where in her special counsel letter to the special counsel did she argue gross mismanagement? I can provide you that citation. I don't have the special counsel citation in front of me. I have the citation from her testimony. For her IRA appeal, I understand that there's an IRA appeal and then there's also the challenge to the demotion. But for an IRA appeal, doesn't she have to exhaust with the special counsel? With the special counsel on the... She filed two complaints with the Office of Special Counsel. She had exhausted everything that's now before us now. Well, that's what I ask you. Where in the special counsel complaint to the special counsel did she raise gross mismanagement? I don't have that in front of me. That's something that I can provide after this hearing if that's... Well, if she didn't raise it, then it's not part of the IRA appeal, right? I mean, part of the argument here is the board found, I think, that she raised arguments about violations of statutes or regulations, but not gross mismanagement. Well, she can raise allegations about what she believes to be violations of law, and then those can, if someone wants to then classify those as gross mismanagement, they're alternative grounds for the statute. I mean, she... What's your basis for that argument? I thought her case law was pretty clear, and the board's case law was pretty clear that in an IRA appeal, you have to specifically exhaust your legal challenges, your whistleblower claims with the special counsel, and if you don't, they're not properly part of the IRA appeal before the board, and gross mismanagement is different than violation of law, rule, or regulation. Ms. Felanis-Renoso is not an attorney. What she did is she presented a set of facts... That doesn't apply differently based on whether she's an attorney or not. I understand that, Your Honor. I think my point is that she presented a set of facts and concerns to the Office of Special Counsel. Facts that she believed... During those complaints, can it reasonably be read as raising gross mismanagement as opposed to violations of law, rule, or regulation? I believe that if the violations of law are so egregious and pervasive... You're just basically saying a violation of law, rule, or regulation is the same thing as gross mismanagement? Not always, but I think... Never. I mean... You have to specifically raise them. Let's just... I mean, obviously, you don't have the citation for us, so let's just move on, but I mean, if she didn't exhaust on gross management, how can that be part of the IRA appeal? I mean, the answer is it can't. So...  Your Honors, this case presents three fundamental legal errors that demand reversal. First, the government violated her constitutional due process rights. While she was on her performance improvement plan, her supervisor engaged in a campaign of secret ex parte communications with the deciding official. Emails Ms. Melanis-Renoso never saw and allegations that she can never rebut. Wasn't that evidence only used, according to the administrative judge here, to assess whether your client had adequate notice? I think that the... That's what the... How the AJ characterized it. Do you think you have an issue regarding the ex parte communication that's broader than whether or not your client had adequate notice? We have an issue with the ex parte nature of it in and of itself. Ex parte under Stone v. FDIC, we look at that as a violation of her rights, not simply to be on notice, but it's all part of the process that went into this. The administrative judge said whatever was in those ex parte emails was cumulative of what was already in the record. And we would argue that it's not cumulative. What's our standard of review on that question? I'll pull that up. Don't we have to uphold that finding that it was cumulative if there's substantial evidence for that finding? I believe that if there's substantial evidence, the determination of whether something is cumulative or not, as I understand it, falls into this area of mixed question of law and  A question, an issue that I have concerns with throughout the AJ's opinion. Where in any of our case law on ex parte communications does it say that that's a question, a mixed question of law and fact? I think the question of whether something is, we have a legal standard of whether something is cumulative or not. We apply. To respond to Judge Hughes' question, do you have a case that supports up the statement you just made about mixed question of law and fact? What's the case? I'd be looking at Roku versus International Trade Commission 9441367 and then Salmon. I have 663F1378 as the citations I have around the questions about the cumulative nature of those emails and whether her due process rights were further violated by those coming into this process. As a fundamental matter, though, are the actual communications you're talking about communications where she was a recipient or sender of the emails? No. These were, these were communications between the Ms. Scott and then who is going to then be the deciding official about her performance. This is not stuff that, the stuff that we are complaining about, it's not stuff that she was going to be on notice of or have prior knowledge of, nor did she have. You said they were communications between Ms. Scott, the deciding official, but I thought that Ms. Scott ultimately was, replaces the deciding official after a conference. I'm sorry, the reviewing official, Ms. Hook, yes. The person who then replaced her, she was communicating with the reviewing official for them to then... What do you mean by reviewing official? For the adverse action, there's the proposing official and there's the deciding official. Yeah, the opposing official, that's what I mean, yes. Ms. Scott was the proposing official? She began... I know that she started out, and there's a very complicated procedural issue here because of an EEO complaint and the like, but the ultimate action we're looking at is not the removal, it's the demotion. Yes. And so the demotion is a different person who's the deciding official. And there were communications to her from Ms. Scott? Is that what you're saying? I mean, the communications you're talking about, at least for the ex parte, have to be communications to the deciding official. I don't recall her name directly, but at the hearing, she testified that she barely looked at them. I don't know if she said they were cumulative, but the administrative judge ultimately found that those communications to her were cumulative. And let's just assume I disagree with you about that being a mixed question of law at  I think whether something is cumulative or not is a factual question. You look at the communications and say, well, where are the information in these communications that are alleged to be ex parte already known to the appellant? And if they were, they're cumulative. And AJ made that finding. Is there a lack of substantial evidence for that finding? I didn't see anything in your briefs that pointed to new information in those communications. It was information that was relied upon in making that decision. The deciding official testified that she didn't rely on them. I think that the, and that's, I understand that that's what the deciding official had testified to at. AJ relied on that. I mean, that's, isn't that substantial evidence? I'm taking you into your rebuttal time also, so if you want to save the remainder. I'll just address, you know, one thing about the clean up the mixed question of law fact issue is that, and then I'll save the rest for rebuttal, is that it's not merely, you know, these particular issues. You know, I, we identify portions in our brief where she is taking, using credibility determinations to resolve what we consider interpretations of internal regulations. I think that's more clearly a pure question of law. And I think that itself would be something sufficient and a procedure of regularity within the AJ's opinion that we need to look at that would be sufficient for reversal. The opinion relies so heavily on credibility determinations to try to insulate itself from review to where I believe it makes mistakes in, you know, deciding too many things under that auspice. And we, we've identified instances of that most prominently in the reply brief. And, you know, that's where I have some of the greatest concerns about that, using factual or credibility determinations to resolve what I would consider to be legal questions or questions that the AJ needed to decide. Okay. Thank you. Thank you. We'll reserve the rest of your time for rebuttal. Ms. Moses. Good morning, Your Honors. And may it please the Court. Excuse me. The administrative judge's decision is supported by substantial evidence and should be affirmed. What we've seen here is that Ms. Bolanos-Reynoso has attempted to introduce new evidence to sort of, sort of a retroactive indication of her allegations, I'm sorry, her disclosures regarding ADA violations and USDA violations. She has attempted to introduce evidence about Mr. Kirk Perry, someone who . . . Do you mean all the stuff in the reply brief about the indictment that happened long after this case was finished? Yes, Your Honor. Well, actually, it was in the 28J notices. I don't want to hear about that unless my colleagues want to hear about that. That's not part of the record before us. You know, they can try to introduce what they want, but we're reviewing the Board's decision based on the record before the Board, and I wouldn't waste your time on that. I understand, Your Honor. I'll move on. Can you address what we were talking about with him? Because I'm still unclear about two things. Did she exhaust claims of gross mismanagement because the ADA didn't seem to think she did? And what's the standard of review for cumulative evidence? And those are two different things, but that's what we talked about with him, so why don't you get to those? Certainly, Your Honor. At the government's brief at pages 29 through 31, we go into some detail there about how Ms. Belanos-Reynoso did not raise . . . there were no issues before the administrative judge regarding protected disclosures concerning gross mismanagement. Ms. Belanos-Reynoso alleged that she made protected disclosures based on violation of laws and regulations, the Anti-Deficiency Act specifically, and also USDA regulations. She also alleged that she made disclosures about . . . on a different date, about similar violations, and support for that, Your Honor, is at pages . . . supplemental appendix pages 379, 384, and 385. Also, at supplemental appendix pages . . . page 1287, is a list of all of the issues that the administrative judge indicated in her pre-hearing summary and order that she would consider to the exclusion of all other issues. There's no issue listed here that relates to gross mismanagement. It all relates specifically to legal violations. And also, to answer the question about whether there were any allegations exhausted through the OSC process, I did not see anything in the record that indicated that. With respect to the standard of review, in Ms. Belanos-Reynoso's reply, she advances this ultimate fact doctrine, but Your Honor, this court has not adopted that, and the Supreme Court, in Pullman's standard, rejected that doctrine, or the use of that doctrine. In this case, if substantial evidence supports the administrative judge's finding, the court must affirm. And with respect to whether the group of emails here was cumulative, that's a factual question. And that's a question that the court can look to see whether there is substantial evidence of that, which there is. It was not new material. This was information that had been included in the notice of proposed removal. It was also information that could be gleaned if you turn the court's attention to Appendix Page 293 and also 1239. There's a November 1st, 2017 email in which Ms. Belanos-Reynoso says to Mr. King, who was her immediate supervisor and who prepared the performance improvement plan, stating that she and her immediate supervisor, Scott, had had, quote, regular performance discussions. And that was really, as Ms. Pletcher-Rice testified, she was only confirming whether Ms. Scott and Ms. Belanos-Reynoso had had discussions during the performance period. This was also not material information. The focus of the, at the time it was a proposed removal but then demotion, was on Ms. Belanos-Reynoso's deficient performance during the performance improvement plan period, that 60-day period. Though she did mention, it was mentioned, I believe, in the first or second paragraph that Ms. Scott had, you know, had many conversations with Ms. Belanos-Reynoso about her deficient performance. Also, excuse me, these emails cannot be seen to have been really prejudicial. I mean, the deciding official reduced the penalty from a removal to demotion. So really what we have here, Your Honor, is that we have ample evidence of deficient performance. Specifically, with respect to mission critical element number four, I believe, customer service and communication, Ms. Belanos-Reynoso doesn't even make any arguments against that. And the agency can remove someone for unsatisfactory performance in just one critical element. So she doesn't dispute that. So all we're really left here with is, was it a fair process? And it was. Can I ask you about another argument that she raised in the briefs, didn't come up yet in oral argument, but this issue that, I guess, Mr. King had not been her supervisor for very long. And they point to a regulation with various conditions when a relatively new supervisor is able to fulfill this role. And their specific argument seems to be that the AJ saw that as a fact question and not an interpretation of law question and simply relied on, I think, an HR official as a factual matter. Is that not an error here? It's not, Your Honor. And if I may clarify a factual point. At appendix pages 73 to 74, the administrative judge relied on the HR official's testimony for the fact that an employee must be on a performance plan for 90 days before they can be rated, but that no rule requires a rating official, that would have been Mr. King, to have been the employee's supervisor for 90 days. So perhaps to the extent that the administrative judge didn't cite the specific regulation here, it is nonetheless consistent with USDA regulation 4040-430, section 9, F5, which can be found at appendix page 1019. 1019 is the applicable reg? Yes, Your Honor. I had thought, so there's a regulation, the relevant part is 5C at appendix 131. Maybe that's not, I may be at the wrong regulation. That was going to be my next question. Why don't we start at 131 and tell me if that has anything to do with this issue. I'll take a look. Specifically, section 5 on new supervisors. I think it's the same. I think it's a duplicate. It's a duplicate, okay. Yes, it looks to be at least from an initial glance here. And I noticed that Ms. Belanos-Reynoso, she does more so point to the A through C paragraphs, and what we point out in our brief is that if you look at that last paragraph there, it says, if those provisions are not in place, and that would have been the case here with Mr. King, the second level supervisor will serve as the rating official, and the third level supervisor will serve as the reviewing official. And so here, Mr. King, as the second level supervisor served as the rating official, and the third level supervisor, Ms. Scott, served as the reviewing official, I believe. I was, I've already forgotten his name, Mr. King, the second level supervisor. I thought he was her first level supervisor. Well, at first, it was Ms., it was Ms. Scott. There was a very complicated change of events because of the change in administrations, I understand. Ms. Scott was her supervisor, her first line supervisor, and then somebody else was her second line supervisor. I believe it was Mr. King. Wait, but Mr. King was the one who then signed off on her rating? Am I getting, who initially did her, the notice that she, put her on a PIP? That was Mr. King. So Mr. King was, I don't, maybe I'm wrong in the facts, but that suggests that Mr. King was her second line supervisor and Ms. Scott was her first line and then they flipped somehow. I thought that Ms. Scott was her first line supervisor. Somebody else was Ms. Scott's supervisor. And then because Ms. Scott was elevated because of the transition, that Mr. King was put in as the first line supervisor, so Ms. Scott could be the second line supervisor. Is that not correct? Because I thought your alternative argument, because it really does seem that this wasn't necessarily complied with, was that even if that was the case, then a new evaluation was done with Ms. Scott as the first line supervisor and her boss, whose name I don't recall, signed off on that. That's in your brief, I think. Yes, it is, Your Honor. I'm sorry. And it is a little cumbersome just trying to sort of map out, you know, how each person sort of transitioned into a new position. But my understanding was that Ms., I didn't, I wasn't aware what different position Ms. Scott took, but just that all of her subordinates were reassigned to Mr. King at a certain point. Because I believe. So you think there was another first line supervisor in between Mr. King and the petitioner? If we're looking at a snapshot in time. I didn't see you arguing that in your brief, but maybe I'm wrong. I thought the argument in your brief was that even if Mr. King couldn't sign off, that the performance evaluation was ratified later because it was reissued with Ms. Scott as the rating official and her superior as the reviewing official. I believe Your Honor is correct. And we can provide supplemental briefing on that if it requires a little more clarification. But my understanding was that Ms. Scott was the rating official ultimately. That she provided the substance of the performance evaluation and then later Mr. King certainly was the one who signed off on the performance improvement plan. Are you also arguing, going back to this regulation, that 5C is satisfied that Mr. King had not been in the supervisory role for 90 days, but there's at least one interim rating to consider in the rating of record? Is that not part of your argument? Let me take a look at that, Your Honor. Court's indulging. What we have. I that certainly would be a closer question, Your Honor, because what we have at Appendix page 259 is a performance appraisal. That was October 26 and then the performance improvement plan letter came a few days. I'm sorry, even preceding the performance appraisal, we have a letter notifying this of deficient performance on October 20th. That would have been, I believe, issued by Ms. Scott. Then we have the performance appraisal that was mostly drafted by Ms. Scott, but issued by Mr. King. So I believe that could potentially satisfy 5C. The argument they're making is, as I said, the AJA mistakenly treated this as a fat question, whether this regulation was complied with and that it should have been a legal question. What is your response? How, if at all, could we affirm, notwithstanding the arguments they're making on this issue? The court could affirm if the court were to find that, even if the administrative judge did not cite to a specific regulation, that if it's still permissible under the law, that Mr. King could have signed the rating. We could interpret this regulation de novo ourselves, right? Yes, that would be a legal finding. And if we interpret it the way it seems to be written, was it satisfied here? I believe it was, yes, Your Honor. Because of the if provision at the end, or because A, B, and C were satisfied? I believe potentially 5C could possibly have been satisfied, given the October 20th letter notifying Ms. Belans-Reynolds of deficient performance, and which . . . I thought when you were speaking with Judge Hughes, you were arguing it more so as the if provision. I was. It was just when Judge Stark pointed my attention to 5C, I just zeroed in on that a little. I think it's really hard for you to argue that 5C is satisfied when there's never been any suggestion from you or the other side that there was actually an interim rating. And you're trying to recharacterize something that's a notice of performance as an interim rating, and maybe if you had argued that to the Board, you could have, but I didn't see that in the record. That was not argued to the Board. Yeah, I think your argument in your brief at pages 39 and 40 is that, even though you don't use the words harmless error, is that even if it wasn't technically complied with, that ultimately her second-line and third-line supervisors agreed to this action because Ms. Scott was her second-line supervisor and Mr. Young concurred in that as well. That properly characterizes the arguments in our brief. Okay. And we would . . . Okay. The Court has no further questions. We will ask that the Court affirm the Board's decision. Thank you. Mr. Austin, she went over a couple of minutes, so I'm going to give you four minutes of rebuttal. Thank you. Ultimately, what we're asking for here is a process both before the AJ and at the AJ free of the type of procedural errors that really left things unaddressed that were very important. I know we may not always agree. We had identified what we considered to be a laundry list of mixed questions of law, effective questions of law. I know we may not agree on every single one of those that the administrative judge did, but we have identified at least one instance where the administrative judge took a legal question and deferred to the belief of the person that this is what this means. That's an abdication of the AJ's role in deciding that. There are . . . Are you talking about this regulation we were just discussing? Yes. The broader point is . . . To the extent we agree with you that that's a legal question, we can look at it de novo, right? Yes, and I think for the reasons you guys said that . . . We're not you guys. I'm sorry, Your Honor. I apologize, Your Honor. Future reference. Sure, I get it, but the government did make the argument in its brief that ultimately whatever rating or the action was signed off on by a second line and third line supervisor. Wouldn't that render it harmless because that would comply with your view of the regulation? No, there's a series of things that must be met that weren't. Procedural safeguards are there for a reason. I think when they're not . . . I'm not what? Let's assume the facts are true, as the government said, that even though . . . I'm getting all the names mixed up, but the first guy . . . I get to say guy. Guy, Your Honor. Shouldn't have signed off on it that ultimately Ms. Scott reissued the . . . Whatever evaluation we're talking about with the concurrence of her supervisor. So it was done with a second and third line supervisor, which clearly would have complied with that regulation. Why wasn't that initial action harmless error since it was ratified later? Well, the question of harmless error in the context of what we're alleging, or alleging a coordinated and strong effort from Ms. Scott to force her out for blowing the whistle. So I think when we start engaging . . . This is a different question, though. I mean, that's the problem is you're blurring your narrative about whistleblower status with whether the PIP procedures were complied with. And whatever that context for the IRA and the whistleblower affirmative defense isn't really relevant to this specific question of did the agency comply with an agency-specific regulation on supervising and reviewing officials, which isn't even required by Chapter 43. Whether it's the way it did it may not at first have been technically correct, but was cured by subsequent action. Yeah. One say, even if something's not required by statute, if an agency holds itself to the regulations.  But you're not addressing whether what seems to be undisputed facts that it was later ratified by Ms. Scott as the second-line supervisor and the third-line supervisor, who I think was Mr. Young, why doesn't that cure any potential violation of the agency regulation? Do you want to answer that quickly or you're otherwise out of time? I don't have an answer there right now. Okay. Thank you. The case is submitted.